UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CIVIL ACTION NO. 1:12-cv-00900-WMS


JEFFREY HEITZENRATER, GERONIMO
PADILLA, TIMOTHY HAWK, VALLIE
MASIAS, JASON ROBINSON, and
MARK GENOVESI, individually and
on behalf of all others similarly
situated,

        Plaintiffs,

-vs-

OFFICEMAX, INCORPORATED and
OFFICEMAX NORTH AMERICA, INC.,

        Defendants.

_____/


        Shavitz Law Group, P. A.
        1515 South Federal Highway
        Suite 404
        Boca Raton, Florida
        10:10 a.m. - 4:28 p.m.
        Thursday, February 26, 2015


- - - - - - - -


DEPOSITION

Of

CHRIS RICHARDSON

- - - - - - - -

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1   looking to trick you or trap you, so I want to make

2   sure you understand what you are answering.

3               I am going to try my best not to rehash

4   the first deposition, but there may by necessity be a

5   little bit of overlap, so you will excuse me in advance

6   if that is the case, but I will do my best not to

7   rehash those topics.  Obviously -- well, actually, let

8   me step back a bit.

9               What is your current job title and

10  employer?

11          **A.    My current job title is Vice President**

12  **for the East Region and I work for Office Depot,**

13  **Incorporated.**

14          Q.    And when did you begin working for Office

15  Depot?

16          **A.    I began working for Office Depot at the**

17  **point of the merger, which would have been November of**

18  **2013.**

19          Q.    And prior to that were you continually

20  employed by OfficeMax since the last deposition?

21          **A.    I have been, I have been employed by**

22  **OfficeMax since then.**

23          Q.    And your last deposition was I think in

24  the spring of 2013.  What was your position at

25  OfficeMax at that time?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    A.    At that time I would have been Vice

2  President of Store Operations.

3    Q.    And did you continue to hold that title

4  with OfficeMax until the time of the Office Depot

5  merger?

6    A.    Correct.

7    Q.    And is the first position you held at

8  Office Depot Vice President of the East Region?

9    A.    Yes -- with Office Depot, yes.  That

10  transition occurred about January of 2014 in terms of

11  titles.

12    Q.    Okay.  And what are your duties as Vice

13  President of the East Regional Office Depot?

14    A.    I oversee our store operations in the

15  East Region, I have 13 District Managers that report to

16  me.  I handle strategic initiatives for the stores

17  within my area, support the corporate office in

18  executing strategies in the field, communicating to

19  District Managers, prioritizing, work communication,

20  train, develop District Managers to ensure their

21  success each and every day, provide feedback, provide

22  input on company strategic decisions both in retail and

23  overall.

24    Q.    And I assume you know generally what the

25  Heitzenrater versus OfficeMax lawsuit is about?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1      **A.**    **I do.**

2      Q.    Okay.  And do you understand you have

3 been designated as the corporate representative to

4 testify today on certain topics?

5      **A.**    **I understand that.**

6      Q.    Can we mark this as exhibit 1, please.

7      (Exhibit No. 1 was marked for

8 identification.)

9      Q.    Can you take a look at what has been

10 marked as exhibit 1 and tell me if you recognize that

11 document.

12      (Witness examining document.)

13      **A.**    **Yes, I have seen this document before.**

14      Q.    And have you been designated as the

15 company's representative to testify on each of the

16 topics specified in this Notice?

17      **A.**    **Yes.**

18      **MR. HUTTON:**  Counsel, with one

19      exception-reservation and that's the one that I

20      had raised on the telephone.

21      He is prepared to testify as much as he

22      can on the decision to classify, topic 6, but

23      as I mentioned to you, that person truly most

24      knowledgeable on that, without an effective

25      substitute since the merger, is Knox McMillan,

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    input to help to develop an accurate job description

2    for any position.

3              Q.    And do you know who was on the team that

4    developed this particular job description?

5              A.    There are several people that would be

6    involved.  So I would have been involved in this

7    particular job description, our Human Resources V. P.

8    would be involved in this, we would have a

9    representative from the Legal Department who would have

10   a representation from the Compensation Group.

11              Those would be the primary people that

12   would be responsible for the development of the job

13   description.  Again, we may get field input as we get

14   drafts developed, but the positions I named would be

15   the primary.

16              Q.    And do you recall who the individual or

17   individuals were in each of those positions that were

18   part of the team to develop this particular job

19   description?

20              A.    So our V. P. of Human Resources would

21   have been Steve Dermanuelian.

22              Q.    How do you spell that?

23              A.    D-E-R-M-A-N-U-E-L-I-A-N.

24              Q.    Okay.

25              A.    From a compensation standpoint it would

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    have been Patricia Abrego-Santucci.

2         Q.    I'm going to make you spell that one,

3    too.

4         A.    A-B-R-E-G -- A-B-R-E-G-O hyphen

5    S-A-N-T-U-C-C-I, I believe.

6         Q.    And legal?

7         A.    And legal would have been Knox McMillan.

8         Q.    And do you recall who, if anyone,

9    provided field input?

10         A.    We would have had certainly Mary Bryan,

11    who was in a dual role of both corporate and field

12    support in Human Resources at this time.

13              Specifically others, I am sure we got

14    feedback from the Territory Vice Presidents at the

15    time.  I don't recall any of them spending any more

16    time or less time versus just reviewing a draft.

17         Q.    Okay.  And what was done to identify the

18    position responsibilities listed on this document?

19         A.    So, one, we had -- we set forth what we

20    wanted to -- we wanted this position to be within the

21    stores in terms of the function that it would play, how

22    it would support our stores and how we were going to

23    operate retail stores going forward, and we used

24    previous job descriptions, you know, to take

25    information, we used collective knowledge of how stores

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    and -- how stores operate on a day-to-day basis and

2    what would be appropriate for this position, and then

3    really determined what were the primary activities that

4    we wanted the Assistant Manager to perform to get the

5    desired outcome of a great customer experience and

6    associate experience in the store each day.

7           Q.    Can you mark that as exhibit 3, please.

8                 (Exhibit No. 3 was marked for

9    identification.)

10          Q.    Off the record.

11                (Discussion off the record.)

12   BY MS. STERN:

13          Q.    Can you tell me what has been marked as

14   exhibit 3, please.

15                (Witness examining document.)

16          A.    Yes.  This is an Assistant Store Manager

17   job description with an updated date of April, 2011.

18          Q.    Okay.  So that is the last changed, it

19   means that the description itself was revised in April

20   of 2011?

21          A.    So, yes, this job description would have

22   become effective in April of 2011.

23          Q.    And last evaluated still says May of

24   2008, correct?

25          A.    It does.  We do an ongoing evaluation of

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1          the exempt status.

2                MS. STERN:  And, actually, I think that

3          this topic on the outline was not limited by

4          date parameters, Lee, so I think it is within

5          the scope of the deposition notice.

6                MR. HUTTON:  I don't read the topic that

7          way.  It talks about complaints, lawsuits and

8          threatened lawsuits as opposed to informal

9          expressions of thought.

10                MS. STERN:  And that is topic 12.  I

11          believe that there are other topics in the

12          outline that address more informal complaints.

13                In any event, we can address that issue

14          later if need be.  The witness has answered the

15          question, so let's move on.

16    BY MS. STERN:

17          Q.    Do you know who was involved in creating

18    this April, 2000 version of the job description?

19          A.    In April, 2011 it largely would have been

20    the same group of individuals that was mentioned for

21    the 2008, with the possible exception, I would have to

22    validate dates, is that Steve Dermanuelian may not have

23    been involved in this one and it would have been Mary

24    Bryan who would have participated in that, but Knox

25    McMillan would have been involved, and Patricia

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

Page 49

1    Abrego-Santucci would have been involved as well.

2          Q.    And what was the impetus for creating a

3    revised job description in April of 2011?

4          A.    There were minor adjustments made to this

5    to create a little bit more of a focus around having a

6    selling environment, to create a slightly different

7    experience for our customers, where we were looking

8    more to have a solutions environment and balance this

9    job description a little bit more, so a little less

10   focus on operational components and a little bit more

11   on selling components.  The changes were subtle.

12         Q.    And was there more focus on customer

13   service in the 2011 job description?

14         A.    So I would say the experience that

15   customers get in terms of how our associates interact

16   with them, so when I say selling environments or

17   selling culture, that is really what I mean.

18               I think we always had a focus on

19   providing a great customer service experience for our

20   customers.

21         Q.    And at the time this job description was

22   revised in 2011 you didn't specifically look at whether

23   the position should or shouldn't be reclassified, did

24   you?

25         A.    Again, as I mentioned, we are constantly

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

Page 123

1                    MS. STERN:  All right, Fran, we are back

2        on.

3                    MR. HUTTON:  She has us on mute.

4   BY MS. STERN:

5        Q.    So prior to the time the position was

6   reclassified as nonexempt, what, if anything, did

7   OfficeMax do to make sure that the ASMs were properly

8   classified as exempt?

9        A.    There would be several things that we

10  would do, you know, a lot of it came from feedback

11  from, you know, the field, any observations that they

12  have.

13                   There would be observations from, you

14  know, people from the corporate office, myself

15  included.  When we visited the stores we would talk to

16  Assistant Store Managers, we talked to Store Managers,

17  we talked to District Managers, we would work with the

18  Legal Department to, you know, talk through what the

19  observations were and validate that, you know, one, the

20  position descriptions, the job description was still

21  accurate, but as well as, you know, any status

22  implications based on what we are seeing and observing,

23  you know, that might impact that job.

24       Q.    Was there anyone in particular, and let's

25  say since the year 2000, who has been charged with

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1 process.

2      Q.    How many times did you speak with Knox in

3 connection with the 2008 job description for the ASM

4 position regarding the exempt status of the position?

5      **A.**    **I don't know that I can recall the exact**

6 **number.**   **It would have been several conversations.**

7      Q.    And was that in person or by telephone?

8      **MR. HUTTON:**   I am sorry.   I did not hear

9      your question.

10 **BY MS. STERN:**

11      Q.    Was that in person or by telephone?

12      **MR. HUTTON:**   Thank you.

13      **THE WITNESS:**   It would have been some of

14      both.   Knox was located in Boise, I was -- my

15      office was in Naperville, so some of those

16      would have been via phone, and when he was in

17      Naperville some of them would have been in

18      person.

19 **BY MS. STERN:**

20      Q.    Can you tell me specifically what was

21 discussed during these conversations regarding the

22 exempt status of the ASM position?

23      **MR. HUTTON:**   Objection, attorney-client

24      privilege, I instruct you not to answer.

25      **MS. STERN:**   Well, Lee, the defendants

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

Page 130

1    written.  There may have been some emails to discuss or

2    set up times.  It would have been highly unlikely that

3    we would have had any details that we would have

4    written.

5                We did most of the communication via

6    phone or in person, as I previously answered.

7                Q.    And why would it be that you would do

8    that by telephone or in person rather than in writing?

9                A.    I would tell you more than anything else,

10   it is just easier to communicate the nuances of the job

11   descriptions and how the business works.  It is not

12   easy to put that in a written form.

13               Q.    And in 2011, when the job description was

14   revised, who made the decision to classify the position

15   as exempt at that time?

16               A.    Again, I tell you the same process that

17   was used in 2008 was utilized in 2011.

18               Q.    And Knox was part of those decisions?

19               A.    Knox was part of those decisions.

20               Q.    And you communicated directly with Knox?

21               A.    I would have communicated directly with

22   Knox.

23               Q.    Is there anyone else in the Legal

24   Department that you communicated with at the time

25   regarding the classification decision?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1          A.    I don't recall communicating with anyone

2   else in the Legal Department.  I would have primarily

3   gone through Knox.

4          Q.    And would anyone else on your team have

5   communicated with someone else in the Legal Department?

6          A.    It would be unlikely.  Knox was our

7   contact for this information.

8          Q.    And is Knox the individual who made the

9   exemption decision in 2011?

10         A.    I would tell you the same process that we

11  utilized in 2008 was utilized again in 2011.

12         Q.    And did you communicate with Knox

13  regarding the 2011 job description both in person and

14  by telephone?

15         A.    It would have been a combination of both,

16  yes.

17         Q.    On how many occasions?

18         A.    Multiple occasions.  I don't know exactly

19  how many.

20         Q.    Can you tell me the substance of those

21  communications?

22         MR. HUTTON:  Objection, attorney-client

23         privilege.  Do not answer the question.

24  BY MS. STERN:

25         Q.    Did you have communications with Knox in

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1          question.

2                    (Thereupon, the question was read

3          back by the reporter.)

4                    **THE WITNESS:**  Yes, there were,

5          discussions would be had, again, as part of

6          just normal ongoing conversations that we would

7          have with legal.

8    BY MS. STERN:

9          Q.    Were there any such discussions that you

10   are aware of that did not involve the Legal Department?

11         **A.    That I am aware of, no.**

12         Q.    And I think you said it was legal who is

13   ultimately responsible for making the exemption

14   determination, is that correct?

15         **A.    They would be actively involved in any of**

16   **those discussions and making any final determinations.**

17         Q.    Were you personally involved in

18   discussions with the Legal Department regarding the

19   exempt status of the ASM position?

20         **A.     I have had discussions with Knox McMillan**

21   **within the Legal Department around the job**

22   **descriptions, as we discussed earlier.**

23         Q.    And when you say "around the job

24   descriptions, as we discussed earlier," are you

25   speaking about the 2008 and 2011 ASM job descriptions

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    that we marked?

2         A.    Yes, that would be correct.

3         Q.    And were those discussions in conjunction

4    with the preparation and issuance of those job

5    descriptions?

6         A.    That would have been a component of those

7    discussions around the job descriptions and the

8    responsibilities and duties of an Assistant Store

9    Manager.

10        Q.    So is it the case, then, that as part of

11   creating those job descriptions in both 2008 and 2011

12   there was a specific inquiry as to the proper

13   classification of that position?

14        A.    I don't know that I would call it an

15   inquiry versus discussion around what is the Assistant

16   Managers, what have your observations been, what has

17   changed, and Knox and I would have had fluid

18   conversations, not specifically on these two dates, but

19   throughout, you know, time to -- you know, as to how

20   our Assistant Managers are performing their duties and

21   validating that it is accurate.

22        Q.    Well, when that 2008 job description,

23   which we previously marked, was created, did you speak

24   with anyone other than Knox from the Legal Department

25   regarding the classification of those positions exempt?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1        A.    Knox would have been my primary contact

2   in the Legal Department.

3        Q.    Was there anyone else on the team who

4   created that job description that would have spoken

5   with anyone else in the Legal Department about the

6   exempt status of the position?

7        A.    Highly unlikely, not -- almost all of

8   those conversations went through Knox.

9        Q.    Is Knox the individual who made the

10  determination that that position is exempt?

11       A.    He certainly provided counsel.  I would

12  say that it was a collective agreement that we were

13  doing the right thing, making the right decisions, and

14  we had a position description that would accurately

15  reflect what we expected from the Assistant Store

16  Manager position.

17       Q.    And when you said we made a collective

18  decision on the exemption status of that position, who

19  is "we" collectively?

20       A.    It is all of the people that I mentioned

21  earlier, so Knox would have been the lead in that

22  component of it, but we as a team, so myself, Pat

23  Abrego-Santucci and Steve Dermanuelian and/or Mary

24  Bryan would have been a part of those conversations.

25  Knox would have guided us in our decision-making

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1 asserted exemption defenses and good faith

2 defenses, and if the company is relying on the

3 decisions made by and the advice provided by

4 Knox, then I think there is a waiver of any

5 privilege in that regard.

6   **MR. HUTTON:** We are not waiving privilege

7 in this deposition. I don't want to debate it,

8 but we are not waiving the privilege.

9   **MS. STERN:** And you are instructing your

10 client not to answer any questions about the

11 specific discussions with Knox regarding the

12 exemption decision?

13   **MR. HUTTON:** I am instructing the client

14 not to answer that question and I will instruct

15 the client not to answer questions which are

16 covered by the attorney-client privilege.

17   **MS. STERN:** All right. Well, we are

18 going to have to address that with the Judge,

19 then, because I think that we are clearly

20 entitled to know that information.

21 **BY MS. STERN:**

22   Q. All right. Did you have any written

23 communications with Knox regarding the decision to

24 classify the position of ASM as exempt in 2008?

25   A. I don't recall if I had any specific

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1      A.    I don't recall communicating with anyone

2 else in the Legal Department.  I would have primarily

3 gone through Knox.

4      Q.    And would anyone else on your team have

5 communicated with someone else in the Legal Department?

6      A.    It would be unlikely.  Knox was our

7 contact for this information.

8      Q.    And is Knox the individual who made the

9 exemption decision in 2011?

10      A.    I would tell you the same process that we

11 utilized in 2008 was utilized again in 2011.

12      Q.    And did you communicate with Knox

13 regarding the 2011 job description both in person and

14 by telephone?

15      A.    It would have been a combination of both,

16 yes.

17      Q.    On how many occasions?

18      A.    Multiple occasions.  I don't know exactly

19 how many.

20      Q.    Can you tell me the substance of those

21 communications?

22          MR. HUTTON:  Objection, attorney-client

23          privilege.  Do not answer the question.

24 BY MS. STERN:

25      Q.    Did you have communications with Knox in

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1        A.      **That would be correct.**

2        Q.      And you indicated before the lunch break

3    that you had conversations with him in both 2008 and

4    2011 regarding the classification of the ASM positions

5    exempt, correct?

6        A.      **Yes, I consulted with him.**

7        Q.      You consulted with him on that issue both

8    by phone and in person on several occasions, correct?

9        A.      **Correct.**

10       Q.      And your attorney advised you not to tell

11   me about any of those communications, correct?

12       A.      **I seem to recall that all transpiring,**

13   **yes.**

14       Q.      Okay.  Without telling me the substance

15   of the communications you had with Knox on the issue of

16   the exempt status of the ASM position, did you consider

17   what he had to say on that topic with respect to the

18   decision to classify the position as exempt?

19       A.      **Yes, we considered what he would have**

20   **said, yes, it would have had considerable components as**

21   **to what final decision we made, yes.**

22       Q.      In both 2008 and 2011?

23       A.      **Correct.**

24       Q.      And did the team rely on Mr. McMillan's

25   input in that regard in both 2008 and 2011?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

Page 157

1  A.  Yes.

2  Q.  All right.

3  MS. STERN:  Well, Lee, unless you want to

4  reconsider and allow the witness to answer my

5  questions regarding the specific nature of

6  those communications, then it is my intention

7  to file a motion with the court to compel

8  testimony in that regard because we do think it

9  is relevant and that privilege has been waived

10  by virtue of the defenses asserted in this case

11  by the defendant.

12  MR. HUTTON:  The instruction still

13  stands, and we can disagree on that and let the

14  court decide the meaning of the privilege as it

15  pertains to those affirmative defenses.

16  MS. STERN:  That is fine.  And just so

17  you know, I don't want you to think we are

18  hiding the ball, somebody from Fran's office

19  did call the court during lunch to ask if that

20  is something that should be addressed by

21  telephone with the court today during the

22  deposition or afterwards and we were advised

23  that they don't want to hear from us today

24  during the deposition and we should just file

25  motions afterwards, so we are going to go ahead

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1          have been general business -- one, general

2          business, how is the business doing, how are

3          sales compared to expectations.

4                    MR. HUTTON:  And you are free to inquire

5          into all of those.

6     BY MS. STERN:

7          Q.    Okay.  Well, let me just short circuit

8     this a bit, because I am not asking about every

9     conversation you had with him and every conversation

10    you covered.

11         **A.    Okay.**

12         Q.    I am asking specifically about any

13    communications you had with him related to the

14    classification of the ASM position.

15         **A.    I am certain on some of those**

16    **conversations we would have talked about the**

17    **classification of Assistant Store Managers and just**

18    **other position descriptions, job descriptions that we**

19    **had within OfficeMax, the Assistant Manager would be**

20    **included in that.**

21         Q.    Tell me specifically what was said

22    between the two of you during those conversations

23    regarding the classification of the ASM position.

24                    MR. HUTTON:  May I inquire, so that we

25          can determine whether and/or if the boundary of

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    a date and time that would be great, if not, I am still

2    asking you to tell me the general substance of what was

3    discussed.

4                **MR. HUTTON:**  And I am not going to permit

5                you to provide the details and the substance.

6                You may provide topics.

7                **THE WITNESS:**  So I touched on topics.

8                Other topics might include the training that

9                was being conducted in stores, how we are

10               communicating with the stores, and whether or

11               not there has been any feedback or changes in

12               observations around any of our positions in our

13               stores, including Assistant Store Managers.

14   **BY MS. STERN:**

15               Q.    Okay.  With respect to the topic of the

16   job duties and classification of the Assistant Store

17   Managers, I would like you to tell me specifically what

18   you and Knox discussed.

19               **MR. HUTTON:**  Objection, attorney-client

20               privilege.  I instruct you not to answer.

21               **MS. STERN:**  Okay.  We will add that to

22               our motion to compel.  Can you mark this

23               exhibit 7, please.

24               (Exhibit No. 7 was marked for

25               identification.)

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    reporter?

2              A.    Yes.

3              Q.    Did you read any notes you personally

4    took during your first deposition to prepare for today?

5              A.    **I didn't take any notes during that**

6    **deposition.**

7              Q.    Did you review Mr. McMillan's transcript

8    from his testimony in this case?

9              A.    **That was -- I did review his transcript**

10   **briefly.**

11             Q.    And you said you reviewed the documents

12   you signed.  Would those be the corporation's

13   interrogatory answers?

14             A.    Yes.

15             Q.    Did you review the declaration you

16   signed?

17             A.    **I did.**

18             Q.    Can you recall any other documents you

19   reviewed to prepare for today's deposition?

20             A.    **I think most of the documents that I**

21   **reviewed fell into one of those categories that I gave**

22   **you.**

23             Q.    Other than the interrogatory answers and

24   declaration, were the documents that you reviewed, the

25   corporate records, so to speak, the store standards,

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

Page 158

1          and do that.

2                    MR. HUTTON:   Okay.

3     BY MS. STERN:

4          Q.    Are you aware that some of the documents

5     that we sought production of in this case have been

6     identified by your counsel as subject to

7     attorney-client privilege and not produced?

8          A.    I am not aware of any specific documents.

9     If that has happened, I am sure it happened, so.

10         Q.    Have you reviewed the privilege log that

11    your attorneys produced to us in this case?

12         A.    I haven't reviewed a privilege log, no.

13         Q.    Do you know who Adam Barton is?

14         A.    Adam Barton, Adam would have worked on my

15    team in store operations and he was kind of the

16    day-to-day manager of our Workforce Management system,

17    scheduling system.

18         Q.    And what about Kirk Gautreau

19    G-A-U-T-R-E-A-U?

20         A.    Kirk Gautreau, he was in Associate

21    Relations, and so he was part of the Human Resources

22    team and would have been somebody that we would consult

23    against certain associates, how it might impact

24    associates.

25         Q.    And have you ever conferred with either

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

Page 123

1          MS. STERN: All right, Fran, we are back

2      on.

3          MR. HUTTON: She has us on mute.

4  BY MS. STERN:

5          Q. So prior to the time the position was

6  reclassified as nonexempt, what, if anything, did

7  OfficeMax do to make sure that the ASMs were properly

8  classified as exempt?

9          A. There would be several things that we

10  would do, you know, a lot of it came from feedback

11  from, you know, the field, any observations that they

12  have.

13          There would be observations from, you

14  know, people from the corporate office, myself

15  included. When we visited the stores we would talk to

16  Assistant Store Managers, we talked to Store Managers,

17  we talked to District Managers, we would work with the

18  Legal Department to, you know, talk through what the

19  observations were and validate that, you know, one, the

20  position descriptions, the job description was still

21  accurate, but as well as, you know, any status

22  implications based on what we are seeing and observing,

23  you know, that might impact that job.

24          Q. Was there anyone in particular, and let's

25  say since the year 2000, who has been charged with

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1   written.  There may have been some emails to discuss or

2   set up times.  It would have been highly unlikely that

3   we would have had any details that we would have

4   written.

5           We did most of the communication via

6   phone or in person, as I previously answered.

7           Q.    And why would it be that you would do

8   that by telephone or in person rather than in writing?

9           A.    I would tell you more than anything else,

10  it is just easier to communicate the nuances of the job

11  descriptions and how the business works.  It is not

12  easy to put that in a written form.

13          Q.    And in 2011, when the job description was

14  revised, who made the decision to classify the position

15  as exempt at that time?

16          A.    Again, I tell you the same process that

17  was used in 2008 was utilized in 2011.

18          Q.    And Knox was part of those decisions?

19          A.    Knox was part of those decisions.

20          Q.    And you communicated directly with Knox?

21          A.    I would have communicated directly with

22  Knox.

23          Q.    Is there anyone else in the Legal

24  Department that you communicated with at the time

25  regarding the classification decision?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

2/26/2015JEFFREY HEITZENRATNER v. OFFICEMAX

1          A.    I don't recall communicating with anyone

2     else in the Legal Department.   I would have primarily

3     gone through Knox.

4          Q.    And would anyone else on your team have

5     communicated with someone else in the Legal Department?

6          A.    It would be unlikely.   Knox was our

7     contact for this information.

8          Q.    And is Knox the individual who made the

9     exemption decision in 2011?

10          A.    I would tell you the same process that we

11     utilized in 2008 was utilized again in 2011.

12          Q.    And did you communicate with Knox

13     regarding the 2011 job description both in person and

14     by telephone?

15          A.    It would have been a combination of both,

16     yes.

17          Q.    On how many occasions?

18          A.    Multiple occasions.   I don't know exactly

19     how many.

20          Q.    Can you tell me the substance of those

21     communications?

22               MR. HUTTON:   Objection, attorney-client

23               privilege.  Do not answer the question.

24     BY MS. STERN:

25               Q.    Did you have communications with Knox in

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1          **A.      That would be correct.**

2          Q.      And you indicated before the lunch break

3    that you had conversations with him in both 2008 and

4    2011 regarding the classification of the ASM positions

5    exempt, correct?

6          **A.      Yes, I consulted with him.**

7          Q.      You consulted with him on that issue both

8    by phone and in person on several occasions, correct?

9          **A.      Correct.**

10          Q.      And your attorney advised you not to tell

11    me about any of those communications, correct?

12          **A.      I seem to recall that all transpiring,**

13    **yes.**

14          Q.      Okay.  Without telling me the substance

15    of the communications you had with Knox on the issue of

16    the exempt status of the ASM position, did you consider

17    what he had to say on that topic with respect to the

18    decision to classify the position as exempt?

19          **A.      Yes, we considered what he would have**

20    **said, yes, it would have had considerable components as**

21    **to what final decision we made, yes.**

22          Q.      In both 2008 and 2011?

23          **A.      Correct.**

24          Q.      And did the team rely on Mr. McMillan's

25    input in that regard in both 2008 and 2011?

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9

1    A.    Yes.

2    Q.    All right.

3         MS. STERN:  Well, Lee, unless you want to

4    reconsider and allow the witness to answer my

5    questions regarding the specific nature of

6    those communications, then it is my intention

7    to file a motion with the court to compel

8    testimony in that regard because we do think it

9    is relevant and that privilege has been waived

10   by virtue of the defenses asserted in this case

11   by the defendant.

12        MR. HUTTON:  The instruction still

13   stands, and we can disagree on that and let the

14   court decide the meaning of the privilege as it

15   pertains to those affirmative defenses.

16        MS. STERN:  That is fine.  And just so

17   you know, I don't want you to think we are

18   hiding the ball, somebody from Fran's office

19   did call the court during lunch to ask if that

20   is something that should be addressed by

21   telephone with the court today during the

22   deposition or afterwards and we were advised

23   that they don't want to hear from us today

24   during the deposition and we should just file

25   motions afterwards, so we are going to go ahead

Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)
Electronically signed by Nancy Siegel (001-221-640-6100)

f2addf0b-74df-48d8-ba32-25852ceb10c9